**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| SurvWest, LLC | ) | Case No. 24-15214 TBM |
| Tax ID / EIN: 26-4586113 | ) | Chapter 11 |
| Debtor. | ) | |

**UNITED STATES TRUSTEE'S OBJECTION
TO THIRD DISCLOSURE STATEMENT**

The United States Trustee ("**UST**"), by and through his undersigned counsel, hereby objects to the *Disclosure Statement for Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated April 7, 2026 (Docket #409)*. In support, the UST states and alleges as follows:

1. SurvWest, LLC (the "**Debtor**") filed this bankruptcy case under Chapter 11 of Title 11, United States Code, on September 5, 2024.[1]

2. On October 9, 2024, the UST convened and conducted the meeting of creditors pursuant to 11 U.S.C. § 341(a) (the "**341 Meeting**").

3. On January 3, 2025, the Debtor filed a *Disclosure Statement for SurvWest, LLC's Plan of Reorganization Dated January 3, 2025 (Docket #148)* (the "**First Disclosure Statement**").

4. On January 3, 2025, the Debtor also filed *SurvWest LLC's Plan of Reorganization Dated January 3, 2025 (Docket #147)* (the "**First Plan**").

5. On February 7, 2025, TBK Bank, SSB ("**TBK Bank**") filed a *Motion for Appointment of Chapter 11 Trustee (Docket #178)*.

6. On February 12, 2025, the UST filed a *Motion for the Appointment of a Chapter 11 Trustee (Docket #183)*.

7. On February 28, 2025, the Court entered an *Order Granting Motion for Appointment of Chapter 11 Trustee (Docket #201)*.

8. On March 7, 2025, the UST filed a *Notice of Appointment (Docket #213)* appointing Ken Yager (the "**Prior Trustee**") as the Chapter 11 Trustee in this case.

---

[1] Unless otherwise indicated, all chapter, section, federal bankruptcy rule, and local bankruptcy rule references are to the Bankruptcy Code (the "Code"), 11 U.S.C. §§ 101-1532, the Federal Rules of Bankruptcy Procedure (the "Rules"), Rules 1001-9037, and to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Colorado (the "L.B.R.").

1

9. On December 2, 2025, the Prior Trustee filed the *Disclosure Statement for Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated December 2, 2025* (Docket #352) (the "**Second Disclosure Statement**").

10. On December 2, 2025, the Prior Trustee also filed the *Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated December 2, 2025* (Docket #353) (the "**Second Plan**").

11. On January 7, 2026, the UST filed the *United States Trustee's Objection to Second Disclosure Statement (Docket #368)*.

12. On January 8, 2026, Dallas Wilson, Philip Stach, and Travis Looney filed a joint *Objection to Disclosure Statement for Chapter 11 Trustee Plan of Reorganization for Survwest, LLC Dated December 2, 2025 (Docket #369)*.

13. On January 16, 2026, the Prior Trustee withdrew the Second Disclosure Statement and Second Plan.

14. On January 26, 2026, the UST filed an *Application for Order Approving United States Trustee's Appointment of Successor Chapter 11 Trustee (Docket #381)*, though which the UST noted the resignation of Ken Yager and the UST's selection of Matthew Brash (the "**Successor Trustee**") as the successor trustee for the case.

15. On January 30, 2026, the Court entered an *Order (Docket #384)* approving Matthew Brash as the Successor Trustee.

16. On April 7, 2026, the Successor Trustee filed a *Disclosure Statement for Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated April 7, 2026* (Docket #409) (the "**Third Disclosure Statement**").

17. On April 7, 2026, the Successor Trustee also filed the *Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated April 7, 2026* (Docket #408) (the "**Third Plan**").

18. The UST objects to the Third Disclosure Statement as further set for the below.[2]

### **Authority**

19. The Bankruptcy Code, in § 1125(b), prohibits a debtor from soliciting acceptance or rejection of a plan unless a written disclosure statement is first approved by the Court as containing "adequate information." 11 U.S.C. § 1125.

20. Section 1125 defines "adequate information," in pertinent part, as:

---

[2] Unless otherwise identified in this pleading, capitalized terms used herein are references to those same terms as defined in the Third Disclosure Statement and Third Plan.

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1).

21. Some cases have discussed certain basic criteria that a disclosure statement should include in order to be found to have provided adequate information. *See, e.g.*, *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984); *In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. Minn. 1989); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. E.D. Ohio 1988). Ultimately, however, the determination of what is "adequate information" in a disclosure statement is a practical and variable inquiry made on a case-by-case basis. *See In re Aspen Limousine Service, Inc.*, 193 B.R. 325 (D. Colo. 1996). At a minimum, the required information should include all factors known to the plan proponent that bear upon the success or failure of the plan. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929-30 (Bankr. D. Colo. 1981).

22. The UST objects to the Third Disclosure Statement as not containing information of a kind, and in sufficient detail, to enable a reasonable investor to make an informed decision about the Third Plan as further set forth below.

## OBJECTIONS

*Administrative Expense Claim Owed to Matthew Barr (Section VI(A)(2), p.6).*

23. The Third Disclosure Statement asserts that Mr. Barr will be owed approximately $110,000 under a debtor-in-possession financing agreement previously approved by the Court. However, the UST has been unable to identify the bank account transactions where Mr. Barr deposited the debtor-in-possession financing funds into the Debtor's account.

24. The operating reports indicate that Mr. Barr was owed $65,000 under the debtor-in-possession financing agreement at the point the Prior Trustee was appointed. *See* January 2025 MOR, Docket 192-1, p.5. That debt to Mr. Barr appears on the balance sheet filed with the January 2025 operating report. However, the UST could not identify the transactions where Mr. Barr deposited those funds into the debtor-in-possession account.

25. Further, after the appointment of the Prior Trustee and Successor Trustee, it seems the Debtor accepted another $45,000 in debtor-in-possession financing from Mr. Barr. But again, the UST has not been able to identify those deposits into the debtor-in-possession account.

26. The UST previously raised these same concerns in relation to the Second Disclosure Statement. The Third Disclosure Statement not only failed to address the UST's objection, but increased the balance of Mr. Barr's administrative claim from $100,000 to $110,000 without explanation.

3

27.     At a minimum, the Third Disclosure Statement should be amended to identify the date and amount of each transaction where Mr. Barr loaned the Debtor money under the debtor-in-possession financing agreement.

*Administrative Expense Claims (Section VII(B)(1), p.16-17).*

28.     A chart included in the Third Disclosure Statement (p.16-17) anticipates the Debtor will need to pay Administrative Claims totaling $888,526.43 on the Effective Date. However, as described elsewhere (pp.6-8), the full amount of the Administrative Claims is significantly higher, totaling $1,433,110.77. The $888,526.43 figure in the chart is dependent on the Debtor having paid down a significant portion ($544,584.34) of the Administrative Claims prior to the Effective Date. Yet, the Debtor has shown no signs of progress toward that goal. As of the most recently filed operating report (for March 2026) the Debtor had paid a total of $55,000 in professional fees throughout this case. *See* Docket #417, p.3. The $544,584.34 that Successor Trustee expects the Debtor to pay prior to the Effective Date is more than the entire cumulative amount of profits the Debtor has accumulated throughout the 19 months of reporting in this case. In other words, despite the assertions in the Third Disclosure Statement, it does not appear the Debtor is anywhere near on track to pay down the administrative claims by $544,584.34 prior to the Effective Date. Thus, the Third Disclosure Statement should be revised to provide for payment of Administrative Claims consistent with the financial history of the Debtor throughout this case.

29.     Then there's the further problem that even if the Debtor manages to pay $544,584.34 in Administrative Claims prior to the Effective Date, where will the money come from to pay the remaining $888,526.43 on the Effective Date. The explanation in the Third Disclosure Statement is that:

> [T]he Debtor has approximately $1 million of accounts receivable. The Trustee with the help of Matthew Barr, anticipates that the Debtor will be able to collect a significant portion of the accounts receivable within the upcoming months prior to the Effective Date and will thus have sufficient cash on hand on the Effective Date to cover Allowed Administrative Claims.

However, when viewed in light of the Debtor's operating reports throughout this case, it is difficult to see how this proposal offers a feasible solution. The Debtor has consistently maintained somewhere around $1 million in accounts receivable throughout the case. It seems the Debtor regularly collects those receivables, uses that money to fund its operations, and then accrues additional receivables in the process. But if the outstanding accounts receivable are suddenly used to pay off the extensive Administrative Claims on the Effective Date, the Debtor would immediately find itself without the cash it needs to continue operations.

30.     Furthermore, the notion that the Debtor will have sufficient funds available to pay all Administrative Claims on the Effective Date is contradicted by the Financial Projections (Exhibit A) attached to the Third Disclosure Statement. As set out in the Financial Projections, the Debtor only anticipates placing $84,760 in the Net Profits Fund in the first quarter of 2026, but indicates it will somehow pay $221,679 in Administrative Claims from those funds. Similarly, in the second quarter of 2026 the Debtor only anticipates paying $172,928 into the Net Profits Fund,

4

but would then pay $712,539 in Administrative Claims out of those funds. This math makes no sense and contradicts the assertion that there will be funds on hand to pay the Administrative Claims on or prior to the Effective Date.

31.     Bottom line, the UST objects that the Third Disclosure Statement lacks adequate information to explain how the Debtor will pay the Administrative Claims that are due on Effective Date.[3]

*Claim of Enterprise Fleet Management (Class 4, pp.7-8).*

32.     Enterprise Fleet Management ("**Enterprise**") has asserted an administrative claim for $293,798.09, which was allowed by an *Order (Docket #395)* entered on February 20, 2026. However, the Financial Projections only propose to pay Enterprise $80,000 through the duration of the Third Plan. Given that the payment to Enterprise may affect both the feasibility of the Third Plan, as well as the net income available to pay unsecured creditors, the UST objects that the Third Disclosure Statement presently lacks adequate information concerning the treatment of Enterprise's claims.

*Claim of First West equipment Finance (Class 4, p.21).*

33.     First West Equipment Finance ("**FWEF**") filed a claim for $208,448.24. All indications in the Third Disclosure Statement are that the Debtor will pay that claim in full. *See* Third Disclosure Statement, p.10. However, the Financial Projections only provide for a single payment of $14,212 to FWEF. Accordingly, the UST objects that the Third Disclosure Statement does not contain adequate information concerning the payment of FWEF's claim.

34.     In addition, the UST notes that the proposed treatment of FWEF's claim (p.21) contains references to Class 5 and Class 3(e) that are not applicable.

*General Unsecured Claims (Class 6).*

35.     The Third Disclosure Statement (p. 26) indicates that unsecured creditors will receive approximately $3.5 million under the Third Plan. This is a drastic decrease from the $11,602,012 in distributions to general unsecured creditors that the Prior Trustee projected in the Second Disclosure Statement. *See* Docket #352-1. The UST objects that this $8 million dollar decrease in expected payments to unsecured creditors warrants further discussion and explanation. Accordingly, the UST objects that the Third Disclosure Statement lacks adequate information regarding the proposed payments to general unsecured creditors.

---

[3] The UST raised similar objections to the Second Disclosure Statement. The UST re-raises those concerns in case the Successor Trustee can offer some additional explanation or clarification that would resolve the UST's concerns. Absent sufficient explanation, the UST would likely object to confirmation that the Third Plan does not appear feasible (as required by Section 1129(a)(11)) or to satisfy the requirement to pay all Administrative Claims on or prior to the Effective Date (as required by Section 1129(a)(9)).

*Unsecured Claim of Matthew Barr.*

36.     The Third Disclosure Statement includes (without discussion) a $587,622 claim for Mr. Barr as a general unsecured claim. *See Third Disclosure Statement, Exhibit C*. This debt was included on the Debtor's Schedule F (Docket #1), prior to the appointment of the Prior Trustee or Successor Trustee. No proof of claim was ever filed to provide supporting documents concerning the claim, and the Third Disclosure Statement contains no discussion of the Successor Trustee's findings concerning the validity of the claim. Meanwhile, the Third Disclosure Statement does include a finding that "transfers do appear to have been made to Mr. Barr within four years prior to the Petition Date (i) without receiving reasonably equivalent value and (ii) at a time when the Debtor was more likely than not insolvent." *See Third Disclosure Statement, p.14*. Accordingly, the UST asserts that the Third Disclosure Statement lacks adequate information concerning the Successor Trustee's investigation into the validity of the $587,622 debt to Mr. Barr, as well as what defense the estate may have to the payment of that claim.

Losses to Property of the Estate.

37.     On December 20, 2024, Dylan Barr posted a report asserting that the Debtor was the victim of a theft of the following estate assets:

   a.     Trimble R12 GNSS Antenna/Receiver in box – S/N 6022F00167

   b.     Trimble R8-4 in box – S/N 5412459408

   c.     DJI Phantom 4 Pro in case -- S/N 1581F11VKF7D00201SN0

   d.     DJI Phantom 4 Pro in case – S/N 1581F11VKJ4700200600

The UST raised these concerns in relation to the Second Disclosure Statement but does not believe any additional information was provided in the Third Disclosure Statement. The UST objects that the Third Disclosure Statement lacks adequate information concerning the Successor Trustee's investigation and findings concerning the facts surrounding the thefts of estate assets  and whether any insurance claims or other causes of action are available to the estate in connection with those asserted thefts.

*Financial Projections*

38.     The Financial Projections only cover 4 years, even though the term of the Third Plan extends at least 5 years. Without the additional Financial Projections for the 5th year, it is impossible for parties-in-interest to assess the feasibility of the Third Plan, or to assess the assertions in the Third Disclosure Statement that general unsecured creditors will recei9ve approximately $3.5 million over the life of the Plan.

39.     The specific amounts the Financial Projections indicate the Debtor will pay to the various Administrative Claims are inconsistent with other assertions in the Third Disclosure Statement. For instance, the Financial Projections indicate that WGWC will receive $45,188 during 2026, but the Third Disclosure Statement (p.6) otherwise asserts that they are only owed

6

$26,937.90. Similarly, the Financial Projections propose payments of $200,000 to Newpoint, but the Third Disclosures Statement (p.7) otherwise asserts that Newpoint is expected to be owed $275,078.50. Similar conflicts exist for the amounts being paid to the Predecessor Trustee, Trustee, and MW. These inconsistencies prevent the UST and other parties-in-interest from having the ability to assess the feasibility of the Third Plan.

40.     The Financial Projections include proposed payments to Class 4, Class 5, and Class 6 that are to different creditors and in different amounts than those described in the Third Disclosure Statement.

41.     The Financial Projections refer to the general unsecured creditors class as "Class 8" instead of Class 6.

*Liquidation Analysis*

42.     The Liquidation Analysis (Exhibit D) asserts that Debtor's unencumbered vehicles, which have a value of $1,886,990 after the payment of all liens, should be discounted by 30%-99% of their value. No explanation is provided for this immense discount.

43.     The Liquidation Analysis projects that a Chapter 7 trustee would have to pay $575,000 in "winddown, rent, insurance, and utility" expenses before any amounts could be paid to unsecured creditors. The Successor Trustee's assessment of these expenses should be further broken out and explained, especially since the Second Disclosure Statement only anticipated $50,000 for these same expenses.

44.     Due to these issues the UST objects that the Third Disclosure Statement lacks adequate information to allow a full assessment of the liquidation analysis.

*Role of the Plan Administrator*

45.     The Third Disclosure Statement (p.27) asserts that a "Plan Administrator will be appointed under the Plan to exercise independent fiduciary oversight over the Reorganized Debtor." However, the UST's review of the Third Disclosure Statement and Third Plan leaves the UST with concerns that the Plan Administrator lacks sufficient authority to effectively fill that role. For instance, it appears to the UST that the Plan Administrator lacks any actual authority to ensure that the Debtor spends money in line with the Financial Projections. As presently drafted, the Third Plan appears to allow Mr. Barr (who has been repeatedly accused of financial misconduct and mismanagement of the Debtor) complete authority and discretion to decide how to spend estate funds. If so, at the end of each quarter he could elect for the Debtor to purchase unnecessary vehicles and equipment, to stock up on unneeded inventory, or to increase his and his family member's salaries in a way that would completely deplete any Net Profits under the Third Plan, thereby avoiding the requirement to pay anything to unsecured creditors. The UST finds no clear provision in the Third Disclosure Statement or Third Plan that would prevent that result or allow the Plan Administrator to impose a remedy should it occur. Instead, the Plan Administrator's role seems limited to taking whatever money the Debtor decides to leave as Net Profits and distributing those funds to creditors. Without additional guardrails, oversight, and consequences, the role of

7

the Plan Administrator would be illusory. At a minimum, the Third Disclosure Statement should be revised to clarify what authority and discretion the Plan Administrator has to ensure the Debtor is required to utilize estate funds in a manner that is consistent with the Financial Projections.[4]

*Impairment and Voting.*

46.     The Third Plan and Third Disclosure Statement contain conflicting information about the impairment of certain classes of claims. For instance, the Third Plan (p.9) asserts that Class 3 is impaired. However, the Third Disclosure Statement (pp.16-18) identifies some of the Class 3 claims as impaired (*e.g.*, Class 3(a), 3(b), 3(c)) and other Class 3 claims as unimpaired (*e.g.*, Class 3(d), and 3(e)). Given the conflict in this information, it is unclear whether all of Class 3 is entitled to vote on the Third Plan, as well as how those votes will be tabulated (per each sub-class, or as a cumulative amount for all of Class 3)? The Third Disclosure Statement should be amended to resolve these conflicts and to add clarity about the voting process.

*Injunction in favor of Matthew Barr*

47.     The Third Plan contains an injunction in favor of a non-debtor, Matthew Barr. More specifically, the following injunction would become effective upon confirmation of the Third Plan:

> Effective on the Confirmation Date and through the earlier of (i) twelve months thereafter or (ii) the Plan Administrator filing a motion with the Bankruptcy Court for authorization either to convert the Bankruptcy Case to chapter 7 or to prosecute any or all of the Barr Claims, except as otherwise provided herein or in the Confirmation Order, all entities (including, without limitation, the Holders of any Claims or Interests) are permanently enjoined from pursuing any action, claim, or liability against Mathew Barr, or any of his successors, representatives, or related parties, in any way related to the Claims or any other obligations of the Debtor that are treated and discharged or otherwise resolved pursuant to this Plan. The enjoined actions include, but are not limited to, the commencement or continuation of any judicial, administrative, or other action or proceeding, the enforcement of any judgment, lien, or creation of any new claim, or the pursuit of any act to collect, recover, or offset any claim that is discharged or provided for under this Plan against Mathew Barr. The statute of limitations, to the extent not already extinguished as of the Confirmation Date, for all claims subject to this injunction shall be tolled during the pendency of this injunction.

*Third Plan, Section 7.5, p.15.*

---

[4] The UST reserves for confirmation whether a net profits plan, left entirely to the discretion of a manager accused of financial malfeasance against the Debtor, can satisfy the good faith requirements for confirmation under Section 1129(a)(1) and (a)(2), or the requirement that management of the debtor is consistent with the interests of creditors and public policy as required for confirmation under Section 1129(a)(5)(A)(ii). *See   In re SM 104 Ltd.*, 160 B.R. 202, 245 (Bankr. S.D. Fla. 1993) ("Where the proposed officer or director has previously engaged in serious misconduct in managing the debtor or is unfit to manage the debtor, employment is improper under § 1129(a)(5).").

8

48.     The UST reserves for confirmation any objections pertaining to the Court's authority to impose the requested injunction in favor of a non-debtor, which appears to conflict with the ruling by the Supreme Court in *Harrington v. Purdue Pharma L.P.* (*In re Purdue Pharma*), 603 U.S.  204, 227 (2024) and binding Tenth Circuit authority such as *See W. Real Est. Fund, Inc.,* 922 F.2d 592, 600 (10th Cir 1990) ("What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability . . . . The debt still exists, however, and can be collected from any other entity that may be liable."); *see also, Webster Cap. Fin., Inc. v. Newby*, No. 12-2290-EFM, 2013 WL 589626, at *5 (D. Kan. Feb. 14, 2013) ("Because § 524(e) limits a bankruptcy court's equitable power to order the discharge of non-debtor liabilities, a bankruptcy court may not prohibit a creditor from enforcing its rights against a debtor's guarantors."); *In re Midway Gold US, Inc.*, 575 B.R. 475, 505 (Bankr. D. Colo. 2017) (Discussing the binding precedent from *Western Real Estate* as prohibiting "cases where a Chapter 11 plan provides, contrary to § 524(e), for the release of or injunction on claims against a non-debtor, such as a co-debtor or a guarantor, with respect to an obligation jointly owed with the debtor where the non-debtor has not submitted itself to the bankruptcy process.").

49.     Nonetheless, the UST believes certain aspects of the injunctive request require additional information and clarification to properly inform parties-in-interest concerning the parameters of the proposed injunction.

50.     As an initial matter, the UST notes that the language of the proposed injunction is confusing in that it appears on the one hand to propose an injunction for a maximum period of twelve months, but then also asserts that enjoined actions are "permanently enjoyed," creating confusion as to the proposed length of the injunction.

51.     The UST also objects to the breadth of the injunctive provision in that its application to "all entities" and from pursuit of "any action" is far too generic for parties-in-interest to know who and what is constrained by the injunction. For instance, it could be construed as an attempt to limit the criminal proceedings presently pending against Mr. Barr. At a minimum, the Third Disclosure Statement lacks adequate information to identify the specific "entities" the Debtor seeks to enjoin through the proposed injunction, and also, whether any of those entities have given their affirmative consent to the proposed injunction.

52.     Similarly, the injunctive provision requests the Court apply the injunction not only to Mr. Barr, but also to his "successors, representatives, or related parties." Certainly if the Court were to find that it had the authority to impose the requested injunction it would at least need to be able to specifically identify who the injunction protects beyond the generic classification of any "related parties."

53.     For these reasons, and with the reservation of rights to objections to confirmation, the UST objects that the Third Disclosure Statement lacks adequate information concerning the injunctive provisions in the Third Plan.

9

_Other Typographical Errors_

54.     The Third Disclosures Statement (p.21) is missing a discussion of Class 3(f), which is discussed in the Third Plan.

55.     The discussion of the treatment of Class 5(b) contains references to Class 6(b) that are not applicable.

WHEREFORE, the UST objects to the Third Disclosure Statement for the reasons set forth above, and requests such other relief as the Court deems just and proper under the circumstances.

Dated:  May 13, 2026

GREGORY M. GARVIN
Acting United States Trustee, Region 19

/s/ R. Samuel Boughner
By: R. Samuel Boughner, AR#2010272
Trial Attorney for the U.S. Trustee
1961 Stout Street, Suite 12-200
Denver, CO  80294
(303) 312-7252
(303) 312-7259 fax
Samuel.Boughner@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below a copy of the **UNITED STATES TRUSTEE'S OBJECTION TO THIRD DISCLOSURE STATEMENT** was served on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:

Dated: May 13, 2026

SurvWest, LLC
6501 E. Belleview Ave., Ste. 300
Englewood, CO 80111

Matthew Brash, via CM/ECF

Ken Yager, via CM/CF

Aaron J. Conrardy, via CM/ECF

David Wadsworth, via CM/ECF

Jennifer M. Salisbury, via CM/ECF

William Cross, via CM/ECF

Deanna L. Westfall, via CM/ECF

Timothy C. Mohan, via CM/ECF

Douglas D. Koktavy, via CM/ECF

Douglas W. Brown, via CM/ECF

Jonathan Bender, via CM/ECF

Suzanne K. Rosen, via CM/ECF

Shanna M. Kaminski, via CM/ECF

Craig M. Finger, via CM/ECF

Amalia Sax-Bolder, via CM/ECF

Jasond Mock, via CM/ECF

Duncan E. Barber, via CM/ECF

11

Dina Bernardelli, via CM/ECF

Lisa K. Shimel, via CM/ECF

Susanne K. Rosen, via CM/ECF

Steven T. Mulligan, via CM/ECF

Kenneth D. Peters, via CM/ECF

/s/ R. Samuel Boughner
Office of the United States Trustee

12