**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In Re:<br>SURVWEST LLC,<br>　　　　Debtor. | Case No. 24-15214-TBM<br>Chapter 11 |

## OBJECTION TO DISCLOSURE STATEMENT FOR CHAPTER 11 TRUSTEE PLAN OF REORGANIZATION FOR SURVWEST LLC DATED APRIL 7, 2026

Creditors and equity holders of SurvWest, LLC Dallas Wilson, Philip Stach, and Travis Looney (collectively, the "Creditors"), by and through their undersigned counsel, hereby submit this Objection (the "Objection") to the *Disclosure Statement for Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated April 7, 2026* (the "Disclosure Statement") (Docket No. 409) pursuant to 11 U.S.C. § 1125 for lack of adequate information sufficient for a reasonable investor to make an informed decision about the *Chapter 11 Trustee's Plan of Reorganization for SurvWest, LLC Dated April 7, 2026* (the "Plan") (Docket No. 408). In support thereof, the Creditors state as follows:

### INTRODUCTION

This is the third attempt at a disclosure statement and plan in this case. Five months have passed since the Creditors objected to the second iteration. Nothing has changed, except time, which Mr. Barr has used to his advantage. Mr. Barr remains under criminal indictment for six counts of wire fraud and two counts of money laundering arising from his systematic theft of the Debtor's funds. His criminal trial, originally set for March 2025, has been continued five times at his request, most recently on May 4, 2026, days after filing the instant Plan and Disclosure Statement, seeking to push trial past November 6, 2026. *See United States v. Barr*, Case No. 1:24-cr-00372-DDD (D. Colo.), ECF No. 51. The pattern is unmistakable: Mr. Barr delays his criminal reckoning while racing to lock in his position through this Court.

Mr. Barr is not fit to manage the Reorganized Debtor. He is accused of stealing from the very company he seeks to control. He has no oversight, no guardrails, and no accountability under the proposed Plan beyond a Plan Administrator who is explicitly stripped of authority over "operations, management, or business decisions." The Trustee's Disclosure Statement still fails to provide adequate information, and the Plan remains patently unconfirmable. During the nineteen months of this case, over $600,000 appears to have flowed to insider-connected recipients, including $85,088.65 to a Colorado LLC formed at the Barrs' residence. Worse, Mr. Barr now seeks to solicit votes from many of the same creditors who are being asked to testify against him at trial, creditors who deserve to know the outcome of that trial before being asked to entrust their recoveries to the man who stole from them. As set forth in Section III below, the Court should deny the adequacy of the Disclosure Statement and defer solicitation until after Mr. Barr's criminal trial concludes.

US_ACTIVE-212102329.v4-AYSAXBOL-5/13/2026 12:36 PM

## BACKGROUND

1.      SurvWest, LLC (the "<u>Debtor</u>") is a manager-managed limited liability company owned as follows: Dallas Wilson (13.75%), Philip Stach (20%), Travis Looney (2.5%), and Matthew Barr (63.75%). Mr. Barr is the President, CEO, and majority interest holder of the Debtor.

2.      The Creditors each have asserted significant unsecured claims against the Debtor as a result of Mr. Barr's actions. Specifically, Mr. Wilson has asserted an unsecured claim in the amount of $3,647,355.67 (Proof of Claim No. 33), Mr. Stach has asserted an unsecured claim in the amount of $2,552,068.37 (Proof of Claim No. 34), and Mr. Looney has asserted an unsecured claim in the amount of $555,548.77 (Proof of Claim No. 35). Additionally, Mr. Wilson has a secured claim in an amount of at least $150,831.32 resulting from a proof of claim that was assigned to him by KeyBank National Association. Proof of Claim No. 42; Docket No. 305.

## OBJECTION

3.      Section 1125 of the Bankruptcy Code requires that before a debtor can solicit votes to accept any chapter 11 plan, the disclosure statement must contain "adequate information." 11 U.S.C. § 1125(b). The Bankruptcy Code defines adequate information as information that would enable a reasonable investor, typical of holders of claims in a relevant class, to make an informed judgment about the plan. 11 U.S.C. § 1125(a). This is information that is reasonably ascertainable in light of the nature and history of the debtor and the condition of the debtor's books and records. *In re Aspen Limousine Service, Inc.*, 193 B.R. 325 (D. Colo. 1996). "The determination of what is 'adequate information' is a practical and variable inquiry made on a case-by-case basis." *Id.* at 334 (citations omitted). However, case law has provided courts with certain criteria to aid in evaluating the sufficiency or the adequacy of disclosure statements, ranging from "the source of information stated in the disclosure statement" to "the relationship of the debtor with affiliates." *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *see In re Stanley Hotel, Inc.*, 13 B.R. 926 (Bankr. D. Colo. 1981).

4.      The Disclosure Statement does not contain adequate information of a kind, and in sufficient detail, to enable a reasonable investor to make an informed decision about the Plan as required by 11 U.S.C. § 1125 for the reasons set forth herein.

5.      As an initial matter, the UST previously filed a detailed objection to the Second Disclosure Statement identifying numerous independent deficiencies, including failures to disclose investigative findings, administrative insolvency, improper insider treatment, inadequate financial projections, and an unlawful non-debtor injunction in favor of Mr. Barr. *See* UST Objection to Second Disclosure Statement (the "<u>UST Objection</u>") (Docket No. 368). As set forth below, many of those deficiencies persist in the current Disclosure Statement. The Creditors incorporate the UST Objection by reference to the extent it remains applicable and submit that those continuing deficiencies, in addition to the deficiencies specifically addressed below, demonstrate that the Disclosure Statement fails to satisfy section 1125 and that solicitation would be futile.

### A.      Arbitration and Dispute of the Creditors' Claims

6.      A chapter 11 trustee has an affirmative statutory duty under 11 U.S.C. § 1106(a)(3) and (4) to investigate and report on acts, conduct, assets, liabilities, and any facts pertaining to fraud, dishonesty, or causes of action available to the estate. While the Disclosure Statement now includes a section (Art. VII § D) identifying certain potential claims against Mr. Barr, including a $52,009 Range Rover transfer in November 2022, a $128,685 unauthorized transfer in February 2021, and a $225,000 unauthorized transfer in June 2021, the Trustee dismisses these claims as "highly speculative" based on costs and uncertainties of litigation and collection, without providing creditors with the analysis underlying that conclusion. The Disclosure Statement still fails to disclose the results of a comprehensive investigation into Mr. Barr's conduct as required by § 1106, and instead concludes without adequate explanation that reorganization under Mr. Barr's control is the best path forward.

7.      Additionally, the Disclosure Statement continues to omit discussion of reported thefts of estate property, insurance coverage, or potential causes of action arising from those losses, despite their material impact on estate value. *See* UST Objection ¶ 25. While the Disclosure Statement now references the Creditors' counterclaims alleging approximately 3,423 improper transactions totaling $5,465,399.79, it characterizes these claims as having only "speculative" value to the estate without explaining how that conclusion was reached. The Disclosure Statement's conclusory treatment of potential estate claims against Mr. Barr prevents creditors from evaluating the value of those claims, the Trustee's fulfillment of fiduciary duties, and the wisdom of any plan that leaves Mr. Barr in control or grants him equity.

8.      For example, while the Disclosure Statement notes in passing the arbitration proceedings between the Debtor, Mr. Barr, and the Creditors in Article VII § E, it does not provide sufficient, material information to meet the definition of "adequate information." The Disclosure Statement completely disregards the no less than fifteen (15) well established counterclaims that the Creditors have against Mr. Barr and the Debtor in the proceedings. *See* Respondents' Amended Counterclaims attached as **Exhibit A** to the Creditors' prior objection to the Disclosure Statement at Docket No. 369 (the "Arbitration Counterclaims").

9.      As set forth in the Arbitration Counterclaims, the Creditors allege that Mr. Barr, as majority owner and sole manager of the Debtor, engaged in a years-long scheme of fraud, civil theft, breach of fiduciary duty, and breach of contract that resulted in the misappropriation of at least approximately $6 million in company funds. Docket No. 369, Ex. A ¶ 197. The counterclaims assert that Mr. Barr manipulated accounting records, created fictitious invoices, submitted false receipts, and improperly recorded SBA PPP and EIDL loan proceeds as personal loans to himself, while using company funds to finance personal luxury vehicles, travel, entertainment, real estate expenses, taxes, and other non-business expenditures. *See generally* Docket No. 369, Ex. A.

10.     The Creditors further allege that Mr. Barr fraudulently amended the operating agreement to vest himself with exclusive control, coerced and defrauded members into signing agreements and a promissory note, concealed financial misconduct, and falsely claimed the Debtor was insolvent to justify additional control and self-payments. *Id.* Despite admitting much of the wrongdoing during negotiations and promising repayment, Mr. Barr breached a verbal standstill

agreement and continued diverting funds. Based on this conduct, the Creditors brought extensive direct and derivative claims for civil theft (with treble damages), breach of fiduciary duty, breach of contract, fraud, conversion, unjust enrichment, promissory estoppel, fraud in the inducement, wrongful termination, and whistleblower retaliation; and seek damages, restitution, treble damages, fees, and other equitable relief. *Id.* The Disclosure Statement does not disclose whether the Trustee has investigated any of these claims.

11. Yet, the Disclosure Statement now asserts that "$5,080,483.64 of the filed Claims constitute derivative claims constituting treble damages for alleged theft of company profits" and that the Creditors "lack standing to assert derivative claims and that the damages are overstated." Disclosure Statement Art. VI § C. The Creditors are deeply concerned that, despite now having over fourteen months to investigate the issues in this estate, the Trustee appears to be relying on Mr. Barr's representations without further inquiry, despite the multiple fraud allegations against him. Neither Trustee has contacted the Creditors regarding the Arbitration Counterclaims.

12. The Disclosure Statement also seemingly continues to accept Mr. Barr's assertions disputing the Creditors' status as equity holders. The Debtor scheduled the Creditors as holding their rightful percent of equity in the Debtor on the List of Equity Security Holders: Dallas Wilson (13.75%), Philip Stach (20%), and Travis Looney (2.5%), which was signed by Mr. Barr under penalty of perjury. *See* Docket No. 5. There is nothing in the Disclosure Statement that explains the basis for disputing the Creditors' equity, why the Debtor has changed its position, or why the Trustee agrees with Mr. Barr on this point.

13. Moreover, the Trustee's investigation has failed to identify or disclose that Flying Crow LLC, a Colorado LLC organized on February 28, 2025, one week after the Trustee's appointment, by Pamela Barr at the residence she shares with Matthew Barr (19236 E Fair Dr, Aurora CO 80016), has received $85,088.65 in estate funds from August 2025 through March 2026. *See* Colorado Secretary of State, Articles of Organization, Entity ID # 20251250026, filed 02/28/2025; MOR cash ledgers, Docket Nos. 320-1 through 417. The Disclosure Statement does not mention Flying Crow LLC. That the entity carries the Crow surname, the same surname as Susan Crow who is the source of the $50,000 DIP wire, and sits at the Barrs' residence, establishes a family-network pattern spanning both the inbound DIP wire and the ongoing outbound rent stream that the Trustee should both investigate and disclose under § 1106.

14. Similarly, Fortis Law Partners LLC appears on the Top-20 Unsecured Creditors list with a $113,054.93 claim against SurvWest for "Legal fees." *See* Docket No. 4, p. 2. However, Fortis represented Matthew Barr personally as claimant in the arbitration proceeding against the Creditors, not SurvWest as an entity. *See* Docket No. 178-8, pp. 70–72, 107–109 (certificates of service identifying Fortis attorneys as "Attorneys for Matthew Barr"). The Fortis claim thus represents Mr. Barr's personal litigation expenses charged to the company in the very proceeding where the Creditors alleged the $5,465,399.79 in improper transactions. The Trustee's Disclosure Statement does not disclose whether this obligation is recoverable from Mr. Barr as an improper insider expense or is properly characterized as a company liability.

### B.      Minority Business Enterprises Certifications

15.      The Trustee continues to assert that the Debtor's Minority Business Enterprise Certification ("MBEC") makes the pool of potential interested parties even smaller because the certification drives business to the Debtor, stating that "a substantial portion of the Debtor's business derived from the Debtor's Minority Business Enterprise Certification, which derives from Mr. Barr's ownership of the Debtor." Disclosure Statement Art. VII § C. However, the Disclosure Statement still fails to disclose that there is a serious risk that the Debtor's MBEC will be suspended. According to the Disadvantaged Business Enterprise ("DBE") Program - Interim Final Rule ("IFR"), which was posted to the USDOT DBE website on September 30, 2025, all currently certified DBEs are to be reevaluated, and ultimately recertified, for continued program eligibility under new eligibility requirements. *See* 49 C.F.R. § 26.111. A license is subject to mandatory suspension if "[t]he certifier has clear and credible evidence of the DBE's or its SEDO's involvement in fraud or other serious criminal activity." *See* 89 FR 24977, Apr. 9, 2024; 89 FR 55090, July 3, 2024. Mr. Barr's criminal trial was most recently scheduled for July 2026, but on May 4, 2026, Mr. Barr filed yet another continuance motion seeking to push trial past November 6, 2026. The Disclosure Statement does not address what happens to the MBEC, or the Plan's projections that depend on it, if Mr. Barr is convicted.

### C.      The Equity Clause and DIP Loan Funds

16.      The Disclosure Statement still does not sufficiently explain the Plan provision providing that existing shares of the Debtor will be cancelled only if Class 6 votes against the Plan. Plan § 6.2.7. In such an event, 100% of the common stock would vest in Mr. Barr, an insider, to satisfy a $50,000 DIP Loan. *Id.* The DIP loan balance is now estimated at approximately $110,000 on the Effective Date. The Creditors continue to question whether there actually was a valid DIP Loan made by Mr. Barr to the Debtor. The Disclosure Statement still fails to disclose the true source or use of the DIP Loan proceeds. Monthly Operating Reports reflect that the $50,000 wire transfer originated from Susan Crow, not Mr. Barr. *See* Docket No. 94 at p. 37. To the extent that transfer was the alleged DIP Loan made by Mr. Barr, it is unclear why Ms. Crow made the payment and how Mr. Barr can claim that he should be entitled to keep his equity in the Reorganized Debtor as a result. The Disclosure Statement still does not identify the dates, amounts, or transactions evidencing insider DIP advances, nor does it reconcile discrepancies between asserted DIP balances and operating reports. Docket Nos. 94, 108, 141, 166, 192 (balance sheets).

17.      Moreover, the Plan and Disclosure Statement appear internally inconsistent regarding the DIP Loan treatment if Class 6 votes against the Plan. The administrative claims chart in the Disclosure Statement states that the DIP Loan will be "$110,000 repaid in full on the Effective Date of the Plan if Class 6 votes for the Plan or $50,000 if an Impaired Class votes against the Plan," suggesting only $50,000 is repaid in the vote-against scenario. Yet, Plan § 6.2.7 provides that 100% of common stock is issued to Mr. Barr "in satisfaction of $50,000 of the amount lent," implying the $50,000 is satisfied through equity, not cash. Neither document explains the disposition of the remaining approximately $60,000 of the DIP Loan balance in the vote-against scenario, whether it is forgiven, converted, or otherwise treated. This confusion must be resolved before creditors can meaningfully evaluate the Plan's treatment of insider claims.

18. Additionally, the Disclosure Statement does not explain the purpose of the toggle vote for Class 6 (formerly Class 8) and how that impacts the Creditors under Class 7 (formerly Class 9). Specifically, it is unclear whether the toggle is supposed to account for a potential violation of the Absolute Priority Rule. If so, the option for Mr. Barr to keep his equity in exchange for a DIP Loan is a backdoor attempt at a new value plan, without disclosing what the Trustee has done to expose the Debtor to the market under *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). The Disclosure Statement merely states that the Trustee "considered selling the business or its assets" but that the universe of purchasers "would likely be limited." This conclusory assessment is not adequate market exposure under *203 North LaSalle*.

19. Without this information, creditors cannot assess insider benefit, good faith, or compliance with the Bankruptcy Code.

**D.      Unclear Role of Plan Administrator**

20. The Disclosure Statement proposes to retain Mr. Barr as manager of the Reorganized Debtor while appointing a plan administrator, Scott Caruthers. Disclosure Statement Art. IX § D.3. While the Plan now provides somewhat more detail on the Plan Administrator's role than the prior version, including provisions for successor appointment if Mr. Caruthers resigns, a duty of cooperation on the Reorganized Debtor, and authority for the Plan Administrator to seek conversion to Chapter 7 upon default, the Plan *explicitly* provides that the Plan Administrator "shall serve solely in an administrative capacity to receive and distribute payments in accordance with the Plan" and "shall have no authority over the operations, management, or business decisions of the Reorganized Debtor." Plan § 8.3 (emphasis added). This means Mr. Barr will have unchecked operational control over the Reorganized Debtor with no disclosed guardrails, reporting requirements to creditors, or controls over his spending.

21. There is also no mechanism to prevent Mr. Barr from siphoning funds from the Reorganized Debtor *before* a payment default materializes. The Plan Administrator's only remedies, seeking conversion to Chapter 7 or asserting the "Barr Claims", are entirely *reactive* measures that can only be exercised after the damage is done. Given Mr. Barr's documented history of diverting millions in company funds, the absence of any *proactive* controls, such as spending limits, board oversight, regular creditor reporting obligations, or restrictions on insider transactions, are especially problematic.

22. Moreover, the triggers for the Plan Administrator to assert the Barr Claims are narrowly and favorably defined for Mr. Barr. The Plan provides that the Plan Administrator may pursue the Barr Claims only if: (1) the Reorganized Debtor fails to meet projected revenues on a quarterly basis and "such failure constitutes a material variance that is not offset by performance in prior or subsequent periods and materially impairs the Debtor's ability to perform under the Plan"; (2) the Reorganized Debtor defaults on payment obligations and fails to cure within 30 days after written notice; or (3) the Reorganized Debtor "materially breaches" its duty of cooperation. Plan § 8.8.

23. These triggers give Mr. Barr substantial room to underperform, divert funds, or obstruct the Plan Administrator without technically crossing the threshold for action. For example,

Mr. Barr could consistently miss revenue targets so long as the shortfall is deemed "offset" by a single good quarter, or he could engage in self-dealing transactions that reduce net profits available to creditors without triggering a "payment default" because the quarterly deposits technically occur. The Disclosure Statement provides no explanation of how these triggers protect creditors from the specific pattern of financial misconduct alleged in this case.

24.     As another example, the estate paid $85,088.65 to Flying Crow LLC, an entity at the Barrs' marital residence formed by Pamela Barr one week after the Trustee's appointment, under an alleged lease arrangement. Under the Plan as written, the Plan Administrator would have had zero authority to stop such payments because lease obligations are "operations" over which the Plan Administrator has no authority. Plan § 8.3. There is nothing stopping Mr. Barr from doubling or tripling the amount of "rent" that he pays to Flying Crow once the plan is confirmed. Creditors have no reason to believe the Plan Administrator's narrowly defined triggers will prevent Mr. Barr from continuing to siphon money to insiders under the guise of operations or business expenses.

25.     Additionally, a "material breach" of the duty of cooperation is defined to exclude "immaterial delays, good-faith disputes regarding the scope of requests, or inadvertent or promptly cured deficiencies." Plan § 8.7. Given Mr. Barr's history of fabricating documents and providing false information, as alleged in the criminal indictment, the subjective nature of these carve-outs renders the duty of cooperation largely illusory. Mr. Barr could obstruct the Plan Administrator's oversight by characterizing delays as "inadvertent" or disputes as "good-faith," and the Plan Administrator would be forced to litigate the issue in bankruptcy court before taking any action, all while Mr. Barr retains full operational control.

### E.     Inadequate Financial Projections

26.     The Disclosure Statement now discloses insider compensation (M. Barr at $300,000/year, D. Barr at $158,000/year, and P. Barr at $110,000/year), which partially addresses the prior failure to comply with § 1129(a)(5)(B). However, the Disclosure Statement still contains optimistic financial projections showing revenue growing from $7 million (2026) to $8.5 million (2029) that significantly exceed historical performance reflected in the Debtor's monthly operating reports. The Disclosure Statement provides no meaningful disclosure of the assumptions, contracts, payment terms, or contingencies underlying these projections, stating only that the Debtor "projects substantially increased income going forward based upon several new contracts" without identifying those contracts or their terms.

### F.     Continuing Deficiencies Identified by the UST

27.     Several deficiencies identified in the UST Objection to the Second Disclosure Statement remain uncured in the current Disclosure Statement:

28.     First, the Trustee still has not filed the investigative report required by 11 U.S.C. § 1106(a)(3) and (4). UST Objection ¶¶ 16–18. While the Disclosure Statement now includes some discussion of potential claims against Mr. Barr, no formal report has been filed or made available

to creditors as an attachment to the Disclosure Statement. The Trustee's statutory obligation is not satisfied by a conclusory summary dismissing claims as "speculative."

29.     Second, the Disclosure Statement still does not adequately identify the dates, amounts, or transactions evidencing Mr. Barr's DIP advances. UST Objection ¶¶ 19–21. Although the DIP Loan balance is now stated as approximately $110,000, the Trustee has not reconciled the discrepancy between Mr. Barr's claimed advances and the actual bank records, including the $50,000 payment from Susan Crow that appears in the Monthly Operating Reports.

30.     Third, the non-debtor injunction in favor of Mr. Barr remains in the Plan, in violation of *Purdue Pharma*, 11 U.S.C. § 524(e), and Tenth Circuit precedent. UST Objection ¶¶ 33–38. While the duration has been reduced from eighteen to twelve months and tolling has been added, these modifications do not cure the fundamental legal deficiency: the Bankruptcy Code provides no authority for such an injunction outside of the asbestos context of § 524(g). The UST's legal analysis applies with full force to the current Plan.

31.     Fourth, the UST objected that the claims settlement process in the Second Plan improperly attempted to bypass Rule 9019 requirements. UST Objection ¶¶ 28–30. The current Plan appears to have removed the problematic two-tier settlement process and now provides that "[a]ll settlements of Claims shall be subject to the notice and approval requirements of Federal Rule of Bankruptcy Procedure 9019." Plan § 11.1. This deficiency has been addressed.

32.     Fifth, the UST objected that the Second Plan contained conflicting information about impairment and voting for Class 3. UST Objection ¶ 27. The current Plan has streamlined the class structure (now Classes 1–8) and appears to have resolved the prior voting conflicts. However, the Disclosure Statement now asserts that Class 2 (SBA) is unimpaired despite the SBA claims being paid pursuant to pre-petition agreements on which the Debtor was significantly delinquent, a concern the UST previously raised (UST Objection ¶ 23), although the Plan now provides that any unpaid amounts will be included as a balloon payment on the maturity date.

## II.     The Disclosure Statement Should be Denied Because the Plan is Patently Unconfirmable

33.     If a disclosure statement describes a plan that is "so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures." *See In re Eastern Maine Elec. Co-op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) (citations omitted); *see also In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). In this circumstance, solicitation and prosecution of confirmation of the Plan would be futile. *See In re Eastern Maine Elec. Co-op., Inc.*, 125 B.R. at 333 ("[U]ndertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed."); *In re Quigley Co., Inc.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007) ("If [a] plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile.").

34.     Here, the Disclosure Statement describes a plan of reorganization that is legally flawed and incapable of being confirmed for the following reasons:

8

a. The Plan estimates unpaid Administrative Claims as of the Effective Date will total approximately $800,000. Plan § 4.1. The Disclosure Statement states the Debtor has "approximately $1 million of accounts receivable" and "anticipates that the Debtor will be able to collect a significant portion of the accounts receivable within the upcoming months prior to the Effective Date." Disclosure Statement Art. IX § D.1. The Plan's feasibility thus depends entirely on the collection of accounts receivable, a speculative assumption given the Debtor's historical collection difficulties. The first-year projections show zero distributions to unsecured creditors in 2026 after payment of administrative expenses, raising further doubt as to whether the Plan can satisfy § 1129(a)(9) and (a)(11).

b. The appointment of Mathew Barr to run the Reorganized Debtor is not consistent with the best interest of creditors under sections 1129(a)(5)(A)(ii) and 1123(a)(7). Despite the addition of a Plan Administrator, the Plan explicitly strips the Plan Administrator of any operational authority, leaving Mr. Barr, a criminal defendant who has now filed five continuance motions to delay his fraud trial and is seeking to push it past November 2026, with unchecked control over the Debtor's business and finances. The Plan Administrator serves merely as a payment conduit with no ability to prevent the very conduct that necessitated his appointment.

c. The Plan was not proposed in good faith under section 1129(a)(3). While the Trustee now acknowledges potential claims against Mr. Barr, he simultaneously dismisses them as "speculative" and proposes a plan that gives Mr. Barr full operational control with no meaningful oversight. The Trustee's refusal to meaningfully investigate or pursue causes of action against Mr. Barr that might yield the estate millions of dollars, while simultaneously proposing to vest those claims in a Plan Administrator who cannot act on them absent narrowly defined triggers, does not satisfy the good faith requirement.

d. The Plan continues to temporarily prohibit third parties from bringing actions against Mr. Barr, now for a period of twelve months (reduced from eighteen months in the prior Plan). *See* Plan § 7.5. While the Plan now provides that the statute of limitations on enjoined claims shall be tolled and that the injunction terminates early if the Plan Administrator files a motion to convert or prosecute the Barr Claims, the injunction remains a non-consensual stay of actions against a non-debtor that violates *Harrington v. Purdue Pharma L.P. (In re Purdue Pharma)*, 603 U.S. 204 (2024), 11 U.S.C. § 524(e), and the Tenth Circuit's holding in *W. Real Est. Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990). *See* UST Objection ¶¶ 33–38 (setting forth the applicable law in full). The Creditors do not consent to this injunction. Neither the duration reduction nor the addition of tolling cures the fundamental legal deficiency: the Bankruptcy Code provides no authority for a non-consensual injunction against a non-debtor outside of the asbestos context of 11 U.S.C. § 524(g).

9

e.  The Plan effectively permits Mr. Barr to retain or obtain equity without demonstrating a substantial, necessary, money-or-money's-worth contribution subjected to market testing, in violation of *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). It is still not clear that Mr. Barr has paid a single dollar to the estate on account of the DIP loan, given the unresolved questions about the Susan Crow wire transfer. Even if Mr. Barr had paid the DIP Loan, the Disclosure Statement's conclusory assertion that the Trustee "considered selling the business or its assets" but that the pool of purchasers would be "limited" is not sufficient market exposure to pass *203 North LaSalle*. Disclosure Statement Art. VII § C. The Trustee's intuition over the likelihood of market interest is not an adequate substitute for actual market testing of equity value.

35.  The Creditors reserve all rights to bring additional objections to the Plan in due course, including Mr. Wilson's rights to object to the treatment of the Class 1 Claim.

### III.  The Court Should Defer Solicitation Until After the Resolution of Mr. Barr's Criminal Trial

36.  Independent of the foregoing objections, the Creditors respectfully request that the Court exercise its discretion to defer approval of the Disclosure Statement and solicitation of the Plan until after the resolution of Mr. Barr's criminal trial in *United States v. Barr*, Case No. 1:24-cr-00372-DDD (D. Colo.). There are compelling reasons to do so.

37.  Many of the Debtor's creditors are likely to be witnesses in Mr. Barr's criminal case. The criminal indictment arises from Mr. Barr's alleged misuse of the Debtor's funds, the very funds that would have been available to pay these creditors. Soliciting creditor votes on a plan that reinstalls Mr. Barr before those creditors testify about his fraud places them in an untenable position. If a creditor votes in favor of the Plan, signaling confidence that Mr. Barr can manage the business and repay creditors, and then testifies at trial regarding Mr. Barr's fraud, the creditor's trial testimony is undermined. Mr. Barr's defense counsel could use the plan vote to cross-examine creditor-witnesses, suggesting that if Mr. Barr were truly a fraudster, his own victims would not have voted to keep him in charge. This is not a hypothetical concern; it is a predictable and impermissible consequence of soliciting plan votes while the criminal trial is pending.

38.  Mr. Barr has a clear incentive to use plan confirmation as a tool in his criminal defense. A confirmed plan, particularly one in which creditors vote to keep him in control, would allow Mr. Barr to argue to the criminal court that his victims have endorsed his management and believe he can make them whole. This instrumentalizes the bankruptcy process for the benefit of a criminal defendant at the expense of the creditors it is designed to protect. The Court should not permit the plan process to be weaponized in this manner.

39.  Further, the outcome of the criminal trial is directly material to the Plan's feasibility and to whether Mr. Barr should manage the Reorganized Debtor at all. The Disclosure Statement itself acknowledges that "the criminal case against Mr. Barr is scheduled for trial in July of 2026" and that "Mr. Barr may either voluntarily or involuntarily terminate his relationship with the Reorganized Debtor." Disclosure Statement Art. X. But Mr. Barr has already moved to continue

10

that July trial date, filing a joint motion on May 4, 2026 seeking 150 additional days, which would push trial to November 6, 2026 at the earliest. *See* ECF No. 51, Case No. 1:24-cr-00372-DDD. If Mr. Barr is convicted and incarcerated, he cannot run the business. The Plan has no succession mechanism; it does not explain what happens if the sole person in operational control goes to prison. Asking creditors to vote on this Plan without knowing the outcome of the criminal trial is asking them to gamble blindly on the single most important variable affecting Plan feasibility.

40.     Mr. Barr has repeatedly delayed his criminal trial while pressing forward with plan confirmation in this Court. The criminal trial was originally scheduled for March 17, 2025. Mr. Barr obtained a first 180-day continuance on January 29, 2025, pushing the trial to September 15, 2025. *See* ECF No. 15, Case No. 1:24-cr-00372-DDD. His original counsel then withdrew for medical reasons on April 7, 2025, and Mr. Barr spent months unrepresented before retaining new counsel on August 11, 2025. ECF Nos. 37–38, Case No. 1:24-cr-00372-DDD. New counsel immediately obtained a second 180-day continuance on August 12, 2025. ECF No. 40. A third continuance of 120 days followed on January 5, 2026, with counsel citing a recently completed trial and Supreme Court argument. ECF No. 46, Case No. 1:24-cr-00372-DDD. That motion pushed trial to July 6, 2026. And now, on May 4, 2026, less than one month after filing the instant Plan and Disclosure Statement, Mr. Barr filed a fifth joint motion seeking to exclude yet another 150 days from the Speedy Trial calendar, pushing trial past November 6, 2026. ECF No. 51, Case No. 1:24-cr-00372-DDD. Among the stated justifications: that new co-counsel (added March 30, 2026) needs time to review 16.8 gigabytes of discovery, and that the Government has a "trial conflict" in the fall. The pattern is unmistakable: Mr. Barr delays accountability in criminal court while seeking to lock in his position in this Court through his company. The Court should not reward this strategy by permitting solicitation of a plan that may be rendered entirely infeasible when Mr. Barr finally faces trial.

41.     Confirming a plan now, with Mr. Barr as the sole person in operational control, and then having him convicted and potentially incarcerated months later would be catastrophic for creditors. The case would likely need to be converted to Chapter 7 or the plan modified, but only after Mr. Barr has had additional months of unchecked control over the Reorganized Debtor's finances. Given his documented history of diverting company funds, the risk to creditors is obvious and immediate. Deferring solicitation until after trial protects creditors from being forced to accept an irreversible outcome that may prove disastrous within months.

42.     In these respects, the Disclosure Statement fails to provide creditors with adequate information about the impact of the criminal trial. It acknowledges the trial as a "risk factor" in a single sentence but does not disclose: (a) what happens to the Plan if Mr. Barr is convicted; (b) whether any succession plan exists; (c) the impact of a conviction on the MBEC and the revenue projections that depend on it; (d) the impact of potential restitution obligations on Plan payments; or (e) whether Mr. Barr's insurance, bonding, or licensing would be affected. Creditors cannot make an informed decision about the Plan under § 1125 without this information, and this information will be available once the trial concludes. There is no justification for forcing creditors to vote in the dark.

43.     Mr. Barr should not be permitted to continue delaying his criminal trial to extend his window for using the bankruptcy process to his benefit. Mr. Barr has now sought five

11

continuances of his criminal trial. Meanwhile, the Debtor's creditors remain largely unpaid, the estate continues to incur administrative expenses, and Mr. Barr retains control of the company. If Mr. Barr is genuinely able to manage the Debtor and repay creditors, that fact will be no less true after his trial concludes. But if he is convicted, creditors will have been spared the futility, and the harm, of confirming a plan built entirely on Mr. Barr's continued freedom and control.

44.     Accordingly, the Creditors request that the Court defer approval of the Disclosure Statement and solicitation of the Plan until after the conclusion of Mr. Barr's criminal trial, or, at minimum, until the most recent continuance motion is resolved and a firm trial date is set that is not subject to further delay.

WHEREFORE, the Creditors respectfully request that the Court (1) deny approval of the Disclosure Statement for lack of adequate information under 11 U.S.C. § 1125; (2) in the alternative, require substantial amendment and supplementation prior to any solicitation; (3) defer approval of the Disclosure Statement and solicitation of the Plan until after the resolution of Mr. Barr's criminal trial in *United States v. Barr*, Case No. 1:24-cr-00372-DDD (D. Colo.); and (4) grant such other relief as the Court deems just and proper.

Dated: May 13, 2026.                                    Respectfully submitted,

**REED SMITH, LLP**

*/s/ Amalia Y. Sax-Bolder*
Amalia Y. Sax-Bolder, #54959
1400 Wewatta St., Suite 350
Denver, CO 80203
Telephone number: 303.552.3843
E-mail address: Asaxbolder@reedsmith.com

*Attorney for Dallas Willson, Philip Stach, and Travis Looney*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May, 2026, a true and correct copy of the foregoing **OBJECTION TO DISCLOSURE STATEMENT FOR CHAPTER 11 TRUSTEE PLAN OF REORGANIZATION FOR SURVWEST LLC DATED APRIL 7, 2026** was transmitted by electronic means on the parties noted in the Court's CM/ECF transmission facilities.

- **Duncan E. Barber**   dbarber@os.law, ahenderson@os.law;rbohl@os.law; kjones@os.law;kleonhardt@os.law
- **Jonathan Bender**   jsbender@hollandhart.com
- **Dina Bernardelli**   dmb@os.law
- **Robert Samuel Boughner**   Samuel.Boughner@usdoj.gov
- **Douglas W Brown**   dbrown@bdwfd.com, jkreh@bdwfd.com,jmellott@bdwfd.com
- **Aaron J. Conrardy**   aconrardy@wgwc-law.com, 3377058420@filings.docketbird.com; sschillereff@wgwc-law.com
- **William Cross**   wcross@markuswilliams.com, janderson@markuswilliams.com; Docket@markuswilliams.com
- **Craig M. Finger**   cfinger@bhfs.com
- **Daniel Glasser**   DGlasser@chipmanglasser.com, jmcdaniel@chipmanglasser.com; ktidwell@chipmanglasser.com;mwalker@chipmanglasser.com
- **Shanna M. Kaminski**   skaminski@kaminskilawpllc.com
- **Douglas D. Koktavy**   Doug@coloradocreditorlaw.com
- **Jasand Mock**   jasand.mock@usdoj.gov, USACO.ECFCivil@usdoj.gov; caseview.ecf@usdoj.gov
- **Timothy C. Mohan**   tmohan@foley.com, tim.mohan4@gmail.com
- **Steven T Mulligan**   smulligan@cp2law.com, smulligan_66544@ecf.courtdrive.com; agarcia_523@ecf.courtdrive.com
- **Matthew J. Ochs**   mjochs@hollandhart.com, mlforkell@hollandhart.com
- **Kenneth D. Peters**   kpeters@dresslerpeters.com, ehunter@dresslerpeters.com
- **Suzanne K. Rosen**   suki.rosen@vhh.law, srosen@ecf.courtdrive.com; khartogh@ecf.courtdrive.com;kristina.hartogh@vhh.law;bankruptcy.docketing@vhh.law ;bankruptcy.docketing@ecf.courtdrive.com
- **Jennifer M Salisbury**   jsalisbury@markuswilliams.com, janderson@markuswilliams.com; docket@markuswilliams.com
- **Amalia Y Sax-Bolder**   asax-bolder@bhfs.com, aciabattoni@bhfs.com; mhardy@bhfs.com
- **Lisa K. Shimel**   lshimel@os.law, kjones@os.law; ahenderson@os.law; kleonhardt@os.law
- **Harry L. Simon**   hsimon@hlsimonlaw.com, mloseke@hlsimonlaw.com
- **US Trustee**   USTPRegion19.DV.ECF@usdoj.gov
- **David Wadsworth**   dwadsworth@wgwc-law.com, 7002299420@filings.docketbird.com; dtackett@wgwclaw.com, 7002299420@filings.docketbird.com
- **Deanna L. Westfall**   deanna.westfall@coag.gov, Robert.padjen@coag.gov
- **Matthew Brash**   mbrash@newpointadvisors.us

*/s/ Amalia Y. Sax-Bolder*

13